My name is Scott Turow. I'm the president of the Authors Guild, the largest society of published authors in the U.S., representing more than 8,500 book authors and freelance writers. Our members represent the broad sweep of American authorship, including literary and genre fiction, nonfiction, trade, academic, and children's book authors, textbook authors, freelance journalists and poets.[1] Guild members have won countless honors and all major literary awards, including the Nobel Prize for Literature.[2]

The Authors Guild promotes the professional interests of authors: we're advocates for effective copyright protection, fair contracts, and free expression.

It's a pleasure and an honor to be here this morning. I'd like especially to thank this committee for recognizing the severity of the problem we all face and getting the ball rolling with COICA in the fall, which recognized this central and unavoidable truth: any serious attempt to address online piracy must address the third-party enablers of infringement. Anything that doesn't address those enablers is, frankly, a pretend solution to a real problem.

### Our Copyright Policy Inadvertently Encourages Investments in Technologies and Services That Promote Trafficking in Stolen Books, Music, and Movies

After 300 years as one of history's greatest public policy successes, copyright is coming undone. As we meet here this morning, our well-intended policy toward copyright online is

---

[1] The Guild had its beginnings as the Authors League of America, which was founded in 1912 by a group of book authors (including Theodore Roosevelt, who served as the League's founding vice president), short story writers, freelance journalists and a smattering of dramatists. In the 1920s, the Authors League broke into two groups: the Authors Guild and the Dramatists Guild of America.

[2] Pearl S. Buck (1938) (who served as Authors Guild president), William Faulkner (1949), John Steinbeck (1962), and Isaac Bashevis Singer (1978). One Guild member, Elie Wiesel (1986), has won the Nobel Peace Prize.

EXHIBIT D

undermining our virtual and physical markets for creative works.  That policy is in desperate need of update.  The Digital Millennium Copyright Act's "safe harbor" for online service providers has turned out to be an exploitable gold mine for unscrupulous online enterprises.  That safe harbor allows these rogue enterprises to profit from services that encourage and conceal the trafficking in stolen books, music, and movies, while disclaiming responsibility for that illegal traffic.  The DMCA safe harbor has turned copyright's incentives inside out, encouraging massive, global investment in piracy technologies and services.

Our nation's founders gave Congress the authority to enact copyright laws "to promote the progress of science and the useful arts." Copyright laws do this by establishing legally protected markets for creative work.  Those laws, and those markets, have worked beyond any reasonable expectation our founders could have had.  Copyright's markets have for hundreds of years encouraged authors here and abroad to spend countless hours writing books that they hope readers will value and the marketplace will reward.  Nonfiction authors spend thousands of hours immersing themselves in their chosen subjects -- poring over documents, interviewing experts, examining and interpreting facts, theories and events – with the hope that they will be able to contribute something new to public discourse on their subjects and that they will express it in a way that will resonate with readers.  Novelists strive to entertain readers and perhaps shed some light on our world and our place in it.  Children's book authors devote themselves to reaching our nation's youngest minds, using literature to entertain and enlighten them in ways that no other medium can.

Copyright's markets have also drawn massive, irreplaceable investments from publishers and others in our intellectual and cultural life.  Those investments have paid off.  Our great research libraries, holding the carefully crafted thoughts, composed over billions of hours by

2

many of our nation's finest minds, are ample proof that copyright has succeeded brilliantly. So is our nation's economic success, nurtured by the books that have educated and informed our citizens throughout its history.

We have, inadvertently and with the best of intentions, instituted a policy that not only tolerates, but encourages investments in technologies and services that undermine our markets for creative work. We have, oddly but unmistakably, created the ideal environment for nurturing an innovative, global, networked industry that directly profits from trafficking in stolen books, music, and movies. In a digital age, where tipping points are always close at hand, the pirate economy can subvert an industry in a heartbeat.

One is tempted to call it a vast underground economy, but there's nothing underground about it: it operates in plain sight, as I will describe. Money clearly suffuses the system, paying for countless servers, vast amounts of online bandwidth, and specialized services that speed and cloak the transmission of stolen creative work. Excluded from this flow of cash are the authors, musicians, songwriters and the publishers who invest in them. The only benefit to the individual author is a parody of a benefit: that the work of the author will be better known. Authors and artists have always been free to give away their work to build an audience, but there had always been the prospect of making a bit of money in the end, that there would be a functioning market to take advantage of. That prospect is disappearing before our eyes.

Piracy has all but dismantled our recorded music industry. Any business plan in the music industry must now take into account that piracy is the rule, not the exception. In this environment, about the only value a legitimate provider can add is convenience and safety -- the comfort in knowing that the downloaded music is genuine and contains no malicious code. Finding comparisons for the state of the recorded music industry is a near impossibility, because

3

the situation has no precedent.  It's as if shopkeepers in some strange land were compelled to operate with a wide-open side doors that would-be customers can sneak out of with impunity, arms laden with goods.  In that bizarre place, an ever-growing array of businesses that profit only if the side exit is used eagerly assist the would-be customers, leaving the shopkeeper with only one thing to offer paying customers:  the dignity of exiting through the front door.

To get a sense of the scope of the problem we face, I'll describe a couple of businesses operating in the pirate economy.

**Case Study #1: BTGuard.com**

BitTorrent, a landmark technological development for trading stolen digital works online, is wildly popular. It's estimated to account for 18% of global Internet traffic. According to its website:

> BitTorrent is the global standard for delivering high-quality files over the Internet. With an installed base of over 160 million clients worldwide, BitTorrent technology has turned conventional distribution economics on its head. The more popular a large video, audio or software file, the faster and cheaper it can be transferred with BitTorrent. The result is a better digital entertainment experience for everyone.

(http://www.bittorrent.com/btusers/what-is-bittorrent.)

Though its defenders and promoters proudly point to a handful of legitimate uses for BitTorrent technology, everyone knows the real, primary use of the technology:  BitTorrent is to stealing movies, TV shows, music, videogames, and now books what bolt-cutters are to stealing bicycles. A recent study of BitTorrent traffic showed that of the 10,000 most popular files torrented, 63.7% were "non-pornographic content that was copyrighted and shared

illegitimately." ("Technical report: An Estimate of Infringing Use of the Internet" by Envisional Ltd. January 2011.)  35.8% of the content was pornographic (the authors of the study did not try to determine how much of the pornographic material was pirated). Of the remaining 0.50% of the 10,000 frequently torrented files, 0.48% could not be identified. That leaves, according to our math, 0.02% -- precisely 2 files out of the 10,000 studied -- that were known to be neither pornographic nor infringing.

 Demand is booming for torrented content, so service providers have stepped forward to assist those eager to use BitTorrent technology.  Visit the website BTGuard.com (tagline: "Anonymous BitTorrent Services"), for example, and you'll find an operation that cloaks torrents. There's an animation on BTGuard's home page that illustrates the benefits of its service, using the example of a BitTorrent transfer between two computers in New York.  (See Exhibit A, Figure 1).  The animation begins with the words "Without BTGuard" (in caps) and "You downloading with BitTorrent."  In the animation, the recipient's IP number, which uniquely identifies a recipient's online location is plainly visible, so is the recipient's location: New York. The IP number and New York location of the sender are also displayed. The animation briefly shows a dashed line representing the BitTorrent transfer proceeding between the two New York computers. Then, in red letters, the animation warns, "BEWARE: EVERYONE KNOWS WHO YOU ARE AND WHAT YOUR DOWNLOADING!"

 The animation then restarts, and once again it displays, "You downloading with BitTorrent" but this time it's "With BTGuard." (Exhibit A, Figure 2).  Now the animation shows the torrent's dashed line going from the New York sender to an IP number in Toronto associated with  BTGuard's red-and-black logo, before proceeding to the recipient at the other New York location. The animation then reads: "BTGuard gives you a anonymous IP address and encrypts

your downloads."  It continues: "Not even your ISP will know what you're doing. BTGuard is very easy to use: just install our secure client!" It ends with a red-button call to action "JOIN NOW."

It seems BitTorrent is terrific for sharing stolen works, but the downside is that you might get caught:  if IP numbers can be discovered, the traffickers in stolen creative works are at clear risk. BTGuard and other companies have stepped into the breach.

BTGuard is doing its best to make the benefits of its services clear to the public.  On August 14th and 15th of last year, BTGuard (or at least a YouTube user named "BTGuardcom") posted YouTube videos that show how users can "BitTorrent anonymously with BTGuard." These videos, which YouTube reports to have been watched more than 18,000 times in fewer than six months, are also viewable at the BTGuard website. BTGuardcom opened a YouTube channel at apparently the same time.  At least one of the commenters at the YouTube channel saw the potential value of the product, but wasn't yet sold: "in the video you never show how its making you anonymous. show me that then ill buy your product."

BTGuard goes to great lengths to reassure users that their systems will protect anonymity, that users won't get caught. At the bottom of its home page, along with "unlimited download speeds" BTGuard promises "no records of usage stored."  At the bottom of every page at BTGuard's website is a link for its "privacy policy: "Netcrawled LLC [the apparent owner of BTGuard] is committed to protecting your privacy. Netcrawled LLC does not sell, trade or rent your personal information to other companies. Netcrawled LLC will not collect any personal information about you except when you specifically and knowingly provide such information." Then, in bold letters, the operators promise that no traceable information is gathered: "Netcrawled LLC DOES NOT collect your Internet Protocol (IP) addresses or customer usage."

BTGuard wants its customers to know that not only is its service private, it's also first rate. It boasts that its servers are hosted "at Canada's premiere carrier hotel in Toronto & at the world's largest Internet exchange in Frankfurt, Germany. We have multi-homed bandwidth to multiple tier one networks to provide you with optimum reroute speeds." It lists its "backbone providers" as including such industry leaders as "Level3, Teleglobe, Deutsch Telekom, Global Crossings, Tiscali, and Cogent Communications."

So here, in a nutshell, is BTGuard's service offering: it will arrange virtual, clandestine "meetings" in Canada for the exchange of large computer files via BitTorrent, and it will do so using state-of-that art facilities. It charges $6.95 per month for this service and accepts payment through Paypal, so subscribers may use their Mastercard, Visa, American Express, or Discover cards. Those in need of cloaking their other online activities can step up to an enhanced service: for $9.95 per month, BTGuard will secure a subscriber's "entire Internet connection: BitTorrent, E-mail, Web Browsing & all other net services become anonymous!"

As with many online enterprises (and nearly all service providers that help customers trade stolen creative work), BTGuard has an affiliate program. BTGuard's program pays a generous $10 per referral and shares 5% of the earnings of webmasters whom affiliates refer to the service. BTGuard compensates affiliates via Paypal, wire, or check. Appearances matter, it seems, BTGuard's affiliate agreement warns that sites that "promote illegal activities" or "violate or infringe upon intellectual property rights" are unsuitable for their affiliate program. BTGuard is forgiving, however, rejected affiliate applicants "are welcome to reapply to the Program at any time." (Exhibit A, Figure 3.)

As with much of the support system for trafficking in stolen creative work, BTGuard is hiding in plain sight. The contact information at the site is Netcrawled LLC, 151 Front Street West, Toronto, M5J 2N1 Canada. Its phone number is 415-762-3688.

**Case Study #2: ifile.it**

Next, I'd like to discuss to discuss ifile.it, an online file-sharing service that seems to be a one-person operation. Although the proprietor – I'll assume he's male and call him Mr. I for convenience -- appears to work alone, he has know-how and moxie. In a few years Mr. I's been able to bootstrap his little start-up to an operation using two datacenters in North America and at least one in Europe, with year-over-year growth that would make Facebook swoon.

Here's the most useful thing about Mr. I, for our purposes: he's done us the favor of blogging about his efforts. (Exhibit B) He's not a bad blogger, though his posts are a bit infrequent: he's got some personality, and he's brash. Mr. I gleefully takes shots at one of the file-sharing industry leaders, Rapidshare. Mr. I celebrates his operation's successes as it hits milestones, he posts YouTube videos to show people how a new download feature works, and jumps on the Twitter bandwagon. Mr. I even opens up a Google Project page, an online collaboration tool, with the apparent hope of getting others to develop applications that use his service. In the process of blogging, he gives us an insider's view into the business of facilitating online piracy.

**Chronology of a File-Sharing Startup, from Launch to One Million Users**

Mr. I launches his blog on January 2, 2008, before his new file-sharing website, ifile.it, is in beta. He's still running his prior website, mihd.net, which apparently was also dedicated to

online file sharing. On February 21 he decides to speed up the process of transferring content to some of his new servers and moves "a dozen thousand files" onto one of them. On February 29, he apologizes that one of his servers is down for the day, because of some network problems that were "causing me hell for 2 days." Nevertheless, he's live by 10 a.m., which seems to mean that he's no longer in beta with ifile.it.

A series of March 2, 2008, entries in the blog describe many of the details of the file-sharing service. The site's available in about a dozen languages, and it automatically detects a browser's language settings. The site uses "a new distributed filesystem … sort of similar to Amazon's S3 service but specifically aimed at large file hosting." Mr. I describes ifile.it's support for two types of URLs for download links on March 6: a short one and a descriptive one. "You can share either types of URL's with your friends :)"

On April 1, Mr. I thanks his users for helping add languages supported by ifile.it to the list. He reports, "Looking thru' the logs there are some languages such as Japanese, Dutch and Russian which are not on the list but are a sizable percentage of our users." He asks for help in adding additional languages to the list. On April 7, Mr. I reports that users will now have usage statistics available to them in their accounts. He gives as an example a user with 65 GB of storage at ifile.it in nearly 3300 files. The user in the example had downloaded 7.41 MB of files in the last five days.

On May 13, 2008, ifile.it hits a milestone, with more than 100,000 members "who registered and activated and use their accounts regularly!" Mr. I provides a graph showing the healthy growth in ifile.it in its first five months. On June 10, Mr. I reports major upgrades: all of ifile.it servers are getting replaced "new Intel quadcore beasts :) also a new internal network will be added to make it easy to balance high loads and bandwidth usage (we use alot of bandwidth) ,

hopefully this will lead to a marked improvement of the services." On July 1, however, 10 servers on ifile.it's new cluster "are down." On the bright side "The network at the Chicago datacenter is being updated with several Comcast 10gbit connections being added." Mr. I apologizes for the inconvenience.

On July 18, 2008, ifile.it hits a new milestone, 250,000 users.

On August 8, ifile.it increases its upload limit to 250 MB, but then finds that bandwidth is inadequate during peak hours. On August 13 ifile.it doubles its bandwidth at its Chicago network center.

On October 24, Mr. I welcomes "rapidshare refugees." His post describes Rapidshare's business model and is worth quoting at some length:

> I get asked a lot, "how do you plan to compete with the 300lb gorilla in the room called rapidshare?"
>
> Well firstly I would like to think (hope?) that ifile.it doesn't end up like rapidshare, judging by emails received from users this sentiment is shared.
>
> Secondly we don't have to compete, they seems to shoot themselves in the foot every few months, it's sort of amusing as ifile.it doesn't have premium system (not for the foreseeable future anyways) and yet we let people download humongous amounts, in hope that they might become customers one day, I figure the carrot approach is better than the stick and a bit of respect for users is not optional but a requirement.
>
> So welcome aboard and enjoy the ride.

On February 8, 2009, Mr. I asks users to limit heavy downloading to offpeak hours if possible. "[ifile.it] does not block users from downloading at any time but you might find the downloads being slow during peak hours, this is a result of hundreds of thousands of users a day who are not being blocked (unlike other filehosting sites)"

10

On July 23, Mr. I announces a large number of upgrades to the site and a redesign. He's also posted a YouTube video to describe ifile.it's new upload system. On August 24, he reports that a major site overhaul is complete. His file sharing service can now upload 50 files at a time "(that's quite a crazy amount)" and he's providing an API upload so that developers can more easily "script uploads." He also opens a Google Project so ifile.it users can share their code for the new API. (The Project hub is at http://code.google.com/p/ifile-it/)

Mr. I keeps innovating. On October 19, "thanks to Yahoo Browser+ Plugin" ifile.it offers an advanced uploader "drag and drop" option. Then, on October 30, his site suffers a dedicated denial of service attack. Mr. I promises to "keep an eye on this disturbing development," which caused site usage to drop 20% in an hour."

 November 29, 2009, is a red letter day. Mr. I's hard work pays off as he hits a major milestone: "one million registered and verified users." His site is less than two years old.

On February 5, 2010, Mr. I notes that some of his users have built some open source uploaders for his service. They're described at his Google Project Page. He also has posted a new YouTube video.

On March 18, ifile.it gets five new servers (making 45 in all) at a new network operation center in Washington, D.C. The datacenter has multiple 10GB connections through many top level service providers.

On January 31, 2011, a couple weeks ago, Mr. I posts that the maximum file size has been increased yet again, to 1 GB. "Enjoy!"

**The Business Model: Ads**

Through all of this growth, despite the hardware and bandwidth expenses that Mr. I incurs, ifile.it doesn't charge for its services. How does it make money? Through ads at its website. One million users apparently pays for 45 servers and all that bandwith. Mr. I explains in his blog on July 28, 2008, when some users complained that they have to wait for the downloads of their files to begin. "[B]ut unfortunately the server bills don't pay themselves, *this free service exists thanks to our advertiser (who beside our users they are one of the main stakeholders).* ifile.it doesn't charge users for his file-sharing services." (Emphasis added.)

Mr. I's company, for all of its servers and breathtaking growth, is tiny by piracy industry standards. In a chart prepared by compete.com, we see that the number of unique visitors at ifile.it, measured at 110,184 last month and growing 117% in the last year, barely shows up when compared to the big operators, such as Rapidshare.com and Hotfile, each of which are reported to have had nearly 3 million unique vistors in January. (Exhibit C) We need, urgently, to take the profit out of facilitating piracy.

### Recommendations

The Internet presents challenges to our markets for creative works that we have never previously encountered. Infringement that would potentially undermine our domestic markets for creative works has historically taken place within our borders (or could be stopped at our borders), and those who profited from those activities could generally be held personally accountable. That's no longer the case. Facilitators of piracy now operate in every corner of the globe, and their activities directly undermine our markets for books, music, and movies.

Online trafficking in stolen creative work revolves around one core activity: secret, anonymous online file sharing. Facilitators of online piracy host or provide support for that core activity, and they do it while disclaiming responsibility by taking shelter in the safe harbor protections of our Digital Millennium Copyright Act. A key part of the solution to the piracy problem is to hold those who profit from online file-sharing activities legally responsible for those activities. We therefore urge the committee to consider the following as steps, among others, to address online piracy:

*1. Make online file-sharing service providers liable for Facilitating the Trafficking in Stolen Books, Music, and Movies if they frequently host and distribute stolen creative works or provide services that regularly facilitate the secret or rapid transmission of stolen creative work.* Online services that allow anonymous, secret sharing of digital files are clearly subject to enormous abuse. All available evidence suggests that such services will be used as hubs for trading stolen works unless the service provider takes steps to prevent it. Any company proposing to make a business of providing or facilitating file-sharing services should have a clear plan for preventing routine piracy. This should be seen as an essential part of responsibly operating such an enterprise, just as any business has to take care to avoid the public dangers inherent in their operations. Service providers can tackle this issue, just as they've addressed far less destructive menaces such as spam, but they need to accept responsibility for the business activities from which they profit.

*2. Require online file-sharing service providers to register an agent for service of process for copyright infringement actions with the Copyright Office as a condition to accepting credit card payments from the U.S. or ad feeds from U.S. online advertising suppliers.* Foreign file-

sharing service providers can too easily evade our laws while they take money from our residents. Some, such as BTGuard, provide services that encourage the secret transmission of files from one U.S. resident to another by cloaking the exchanges through a foreign service provider. We wouldn't tolerate this meddling in our domestic market in other areas of commerce, and we shouldn't tolerate it in our markets for books, music, and movies. As a matter of common sense, and as a matter of basic fairness to law-abiding U.S. and foreign file-sharing service providers, all those who directly profit from the U.S. market for file sharing should be subject to U.S. rules.

*3. Remove the DMCA safe harbors for online and Internet service providers that provide routine access to online file-sharing service providers that a federal court has found guilty of Facilitating the Trafficking in Stolen Books, Music, and Movies.* After a reasonable notice period, service providers should not be able to disclaim liability for contributory copyright infringement if they provide routine access to a service provider that has been held to be facilitating piracy.

*4. Remove the DMCA safe harbors for online and Internet service providers that provide routine access to online file-sharing service providers that have not registered an agent for service of process for copyright infringement actions and for which the Copyright Office has received at least 50 DMCA take-down notices.* After a reasonable notice period, allowing adequate time for the online file-sharing service provider to register an agent for service of process for copyright infringement actions, service providers should not be able to disclaim liability for contributory copyright infringement if they provide routine access to an online file-sharing service provider that has been the subject of numerous DMCA take-down notices.

*5. Ensure that new legislative action can keep pace with developing technologies.*

Although online file sharing services are one of today's major piracy threats, illegal streaming is rapidly gaining in popularity and can pull in audio books as easily as it does music, movies, and TV programs. Any congressional solution needs to take the pace of technological change into account, or we'll all be back here in twelve months.

## Conclusion

Facilitating online piracy has become far too widespread, because it's far too profitable and easy. To protect and re-establish our markets for creative work, we need bold, immediate reform of our copyright law.